Several significant and some basic issues of patent law are presented in this appeal. The District Court went off track in this case by accepting two erroneous legal premises, which are summarized at page 12 of the Blue-Green. First, Syngenta urged the District Court to accept the premise that all of the claims of both Lundquist patents are dependent claims. And from that, they then jumped to a conclusion of no liability for infringement. The second erroneous premise was that Syngenta also urged the District Court to give, quote, effect to the functional language in the claims of the Shaw patent. That resulted in mislabeling the Shaw claims into, instead of being a claim for a gene, to a claim for a plant. And by those two fundamental errors, it gave a complete, total disregard to the actual language used in the claims. The first one, you've got claim four, doesn't it have within it, doesn't it read within it the process of claim one? It does not read totally within it the process of claim one. It includes having those process limitations have to be performed at some time. But it is by itself an independent, one-step process of creating progeny plants by using the novel starting material of claim one. Do you agree that as it was originally drafted, it was clearly drafted in dependent form? I do agree, Your Honor. It was originally drafted as in dependent form, and then that was prosecution claim 30. It was then amended. And the prosecution history actually supports Monsanto and DeKalb's position here that it is an independent claim. So the one limitation you think that's in this claim is obtaining the progeny of a plant. No, that's not the one. How is that not prior art since Adam and Eve? I'm not saying that that is the one limitation. That is the act of infringement generating progeny. That's the only limitation you find in the claim, though? No, sir. Your Honor, I don't find – you have to have – the steps of claim one have to have been performed at some time. So the steps of claim one have to have been performed. That's the novelty of it, and the further step of novelty is producing the progeny of claim one. Well, then doesn't that make it dependent by definition? No, it doesn't by definition because you have to look at exactly what the claim reads and how the claim reads. And if you look at claim four, it says a process comprising obtaining progeny from a fertile transgenic plant obtained by the process of claim one, which comprises, say, DNA. So simply by referencing the novel starting material doesn't turn it into a dependent claim per se. You're saying there are magic words that have to be used to make something dependent? There are statutory definitions of what is a dependent claim, and the NPEP actually sets forth that this is the statutory form of a dependent claim. So there are some magic words that can be used, but this is not the magic words where it says claim one and then further comprising by adding an additional narrowing limitation. Aren't we taking form over substance, though? No, we're not. In this case, well, the form is very important. The language and the way the words are set up in the claim as this court has recognized over and over again is important. And so when you look at the preamble of claim four when it says a process comprising, and the step of the process is comprising progeny from a fertile transgenic plant, which is defined by claim one. But, Ms. Null, if I write a claim one with steps A, B, and C, and I add claim four with step D, that would be a particularly dependent claim, wouldn't it? That's the structure of it. A, B, and C in claim one, claim four adds step D. And depending on the language of the claim, if it says further comprising step D. The problem is your claim references another claim, not a starting material. It doesn't reference a starting material, it references another claim and thus reads that claim into your claim, does it not? No, not by the exact language of the claim. A plant obtained by the process of claim one, you are reading that claim one into your claim. I'm reading the fertile transgenic plant of claim one into claim four. So it is just like a product by the process. If I claim a product by the process of steps one, two, and three, then I have to perform steps one, two, and three. So this is claiming a process using the starting material of a product which has been made by this process of steps one, two, and three. So actually what this turns into, if you break it down into its parts, is a process claim that has in it a product by process claim. But that does not turn it into a dependent claim. And if it's a product by process, do you have to perform the process to infringe the product by process claim? The process has to be performed by somebody at some time. You performed it, yes. We performed it. DeKalb performed the process of making the GA-21 original plant. But in all of the rules of this court, it is only clear that the limitation has to have been conducted. It doesn't say by who, and it doesn't say by when. So it's clearly within the contemplation that so long as these limitations, and there's no dispute that every limitation of claim four was performed by somebody at some time. And the question is when was the process of obtaining the progeny done? It was done by Syngenta, and it was done during the term of the patent, and that is infringement. And so the district court summary judgment should be reversed on that basis of independent claim one. Can I go back to my first question, though? You say that it was amended, but wasn't it amended after issuance? No, it was amended not after issuance. It was amended before it became issued. So what they did is they basically took prosecution claim 30 and rewrote it to independent form. And in doing that, the comment was made that it doesn't add new matter and it doesn't change the scope of the examination. The examiner agreed with that because what happened here is Lundquist and Walters, the inventors on these patents, were the first people in the world to figure out the process for making fertile transgenic corn plants and then taking that process and making further progeny plants from that very novel starting material. This is not unlike where somebody comes up with a new pharmaceutical composition and then says administering it to humans. It's still a novel claim. It's still a use of that claim. But this is not unlike other situations where somebody has come up with a completely new thing and then patents it in different ways. So you're saying the examiner understood that you were intending to change from a dependent to an independent claim and accepted that change? Yes, and it didn't change the scope of the examination in any way. There was no other prior art that would come into play, and I think the examiner understood that. When they looked at the claim, they accepted it. Where in the record does it reflect that the examiner understood that? Because when the cow represented in the prosecution history, it's not new matter and it doesn't require an additional search. The examiner accepted that. If the examiner thought it was something different and thought it dramatically changed the scope of the invention, he would have said no and not allowed the amendment, but he did. Doesn't that really support the fact that it was a dependent claim at that point? It wasn't. That supports the fact that it was. 30 was a dependent claim. It was a dependent claim because it says the step of further comprising. Right. Because the exact terminology used in these claims is very important, and that language was changed to the issue claimed for. Does that expand the claim at that point? No, it doesn't expand the claim because the scope of the invention wasn't changed. The disclosure and the specification is very clear about here's what we did. We made the original plant, and then we took it and we made progeny plants from the original plant, all of which was novel. So it never changed the scope. It didn't bring in any new prior art. There was no other prior art that could come into play. And so it did not change the claim subcompletely enough that required an additional search or added new matter that would have caused a patent office to be charged. This would get you around having to have licenses, wouldn't it? You wouldn't have to have any licenses in the future. Anybody who used your plant in any way would be infringing. So long as they were unauthorized and didn't have a license, yes, that's true. Because they're using the patented process. You do this by license today, right? Yes, except for Syngenta, whose acts are unauthorized. Who was before you got into licensing. No, Montanum and DeKalb have been in licensing since all genetically engineered plants came into the market. No, but before this patent even issued is the problem you've got, right? The steps of claim one were performed before the patent ever issued in this instance. But under 271G, Your Honor, that doesn't matter that the steps were performed. Because what becomes the focus of the inquiry and the other error that was made by the district court as a matter of law, completely as a matter of law, was under Section 271G. And that is it doesn't matter who performed the process or where they performed it or when it was performed. The inquiry for the infringement is was there a use of a product made by the patented process? Now the error by the district court here is solely one of law. The district court held as a matter of law that 271G doesn't apply to processes performed in the United States. That's just wrong as a matter of law. The legislative history at all confirms that while that kind of notion was involved in the actual drafting of the original bills that were going to this notion, the legislature says no we can't do that because of gap. But putting aside whether or not the district judge really found that, I know there's a dispute as to whether that was the issue. But even if it was, couldn't we affirm the district court's decision on our own interpretation of 271G? I think that the court would have to interpret it consistent with the legislative history. And if you do construe it with the legislative history, then it has to be that this is an infringement because they made use of the product of a patented process. But the problem is because the process has to be performed during the life of the patent, we have to buy your argument that claim four was an independent claim in order for you to win under 271G. Isn't that right? No, Your Honor. Even if you construe it to be a dependent claim, there's still infringement because the infringing act is use of the product. So it's actually not performance of the process, it's actually use of the product that constitutes an infringement under 271G. But the law is clear that the process has to be performed during the life of the patent for the use of the product to be actionable under 271G, isn't it? Well, the law is not clear on that, Your Honor. And the issue has never been actually put before this court before as to when infringement of a process patent actually occurs. Now, Micogen case that's been cited by both sides doesn't address that issue. And the issue in the Micogen v. Monsanto case was that all of the steps of the process had been performed prior to patent issuance, well before patent issuance. And that is not the case that we have here. What we have here is a process that was started before patent issuance and then the last step performed during the term of the patent. So we have – where you have a process that takes a fairly long time to do, you wind up with this situation, believe it or not, which has not been addressed by this court, where a process is started before a patent issues and is completed – the last step of the process is actually completed after the patent issues. Now, under this court's precedent in general foods, the answer has to be that a process is not infringed, a process patent is not infringed until the last step is performed. Otherwise, there's no infringement. So you have to have each step of the process performed. And even if you construe the Lundquist claim to be a dependent claim, the last step is generating the progeny. And Syngenta generated the progeny during the term of the patent. So this is a unique issue that's been presented to the court really for the first time. It's what happens when you have a process started before. So when does infringement of a process patent occur? But the district court at least believed that your reliance on general foods was not well taken because she found that it was distinguishable on the facts, correct? But the district court's mistake, I believe, was that she imposed a liability requirement for the first three steps or first steps of claim one, which do not exist. The law is that all the steps have to be performed, but there doesn't have to be resulting liability for the first three steps. And I think that's where the district court really went astray here as to say it doesn't – there has to be liability for steps one, two, and three before there can be liability for step four. But neither Syngenta nor its agents performed all those steps. They performed the last step of the process. They performed one. They performed the last step of the process during the term of the patent. So this was a case where there is infringement under 271G for having used the product. So even if Syngenta did not perform the steps, they still have liability under 271G for using the product of a patented process. And there's no requirement under 271G that they have to perform the process in order to infringe a product use. But in order to reach that point, though, we would have to find a claim for as an independent claim. No, Your Honor, you don't. You can as a dependent claim because we're looking – the inquiry is focused on the product. So all of the steps have to – the patented process is not the focus of the inquiry. The focus is the product that is used. And the GA-21 used by Syngenta is no doubt the result of the patented process of claims – claim four, even if it's construed in a dependent way. Just one more point on this. This may be quibbling over semantics here, but you said the district judge said there had to be liability with respect to the first three steps. Isn't what the district judge said the first three steps had to be undertaken without authorization? It wasn't that there had to necessarily be liability. That's a distinction, isn't it? That is a distinction, but her conclusion was that because DeKalb performed the first three steps – and DeKalb couldn't be – had authority or did not have authority, but because DeKalb had authority, there was no liability. And that just can't be. So she imposed upon the first three steps not just that they had to be performed or performed by somebody at some time. She decided there had to be liability for the first three steps as well. Now I'd like to turn just briefly – I think we've exhausted your time. Can you give us one sentence on your enablement issue? Yes. I can give you one sentence. It is that the district judge in this case, even if you were to accept the claim construction, which we believe is erroneous, made the wrong enablement inquiry, that the controlling cases here have to be Amgen and CELPRO because they are the same types of the nature of the claims. And in those cases, the enablement inquiry and this law of enablement is that you have to enable aid use, not every single foreseeable later developed technology. Thank you. Ms. Noll, we've exhausted your time. We'll give you back three minutes of rebuttal time. Would you give Mr. Dunner an extra three minutes should he need to use it? Good morning, Your Honor, and may it please the Court. What Ms. Noll has totally ignored is what happened during the prosecution history of the 880 patent, where representations made by the applicant and also statements made by the examiner make absolutely clear that Ms. Noll's theory about her claim is not a sound theory. She amended that claim, or the applicant amended that claim, after the close of prosecution, which not after the patent issue, but after the close of prosecution. And at the time that claim was amended, the statement was made that it was allowable without further search or consideration. Well, when you take a four-step claim, which she admits it was, because she admits it was Claim 30, it was dependent, four steps, three in Claim 1 and one in Claim 4, and you convert it to a one-step claim, you sure do change the scope of that claim. You sure do change the scope of consideration. You sure do change the obligation of the examiner to decide whether that much broader claim is patentable or not. She says, Mr. Dunner, she didn't change it from a four-step to a one-step. She says that the three steps can be performed whenever by whom whatsoever. They still have to be performed. I don't agree, Your Honor, with due respect. She said originally Claim 30 was a dependent claim, and under Section 112, Paragraph 4, when you have a dependent claim, which she acknowledges it was at that time, you have all the steps of the parent claim and in addition to the steps. So at that time, it was a four-step claim. The question is when she amended it or when the applicant amended it, Ms. Noll didn't amend it, was it converted to a one-step claim? The statement that it was without further search or consideration is inconsistent with that. But more significantly, the examiner entered it and said it was directed to matters of form not affecting the scope of the invention. So are you agreeing that if it wasn't for that, that if you looked just at the language, the way the language is written now, it clearly is written in a manner that would otherwise require us to read it as an independent claim? No, I don't agree with that, Your Honor. First of all, it refers, it uses the earmarks that are set forth in Section 112, Paragraph 4. It refers to another claim. It adds another limitation, and then it talks about said DNA, which is only found in Claim 1. It is not the perfect form for a dependent claim, but I submit it was a dependent claim, and before and after, and in fact, DeKalb admitted that in the Northrop case in Illinois. Here's the quote. They were talking about Claim 4 of that same patent. It says processes that are covered by this claim must comprise at least the steps listed in subparts 1 to 3 of Claim 1 and the additional step of obtaining progeny from a plant obtained by the process that has at least those steps. That is exactly our point. At that point, their ox was not being gored, and they were able to tell it like it is. Today, their ox is being gored, and they're not able to tell it like it is, or they'd lose the case. And the judge came back, and we have it in our brief, and acknowledged that it was a four-step claim. So I suggest, Your Honors, that that claim is dependent, that claim requires four steps, and since it requires four steps, it is not infringed for a number of reasons. One, we didn't, Syngenta did not practice the first three steps. It was practiced with authorization. It was practiced by DeKalb, and Section 271A talks about without authorization, and 271G talks about without authorization. Also, both of those sections of 271 require that the patent invention be done during the term of the patent. The Micogen case makes absolutely clear that, even though in that case all the steps were done before the patent issued, makes absolutely clear that, in fact, you have to look, it has to be practiced within the term of the invention. When do you practice this process? The answer is in General Foods. General Foods makes clear, I know that Monsanto relies on General Foods, how I don't know, but General Foods says you can't break down a combination of multiple elements or multiple steps into independent elements. You don't infringe Claim Element A, you don't infringe Step A, and you don't infringe the last step, Step 4. It's got to be done in combination, and it has to be done within the term of the process. This is a fiction to look at only the last step. The last step ends the event, but you've got to have all steps within the patent term in order to infringe that claim. Even if the final step is within the patent term, that means that the first three steps, even though they're outside of the patent term, you'd be performing the first three steps within the patent term in order to perform the fourth, wouldn't you? You have to perform all four steps within the patent term under General Foods, which doesn't deal precisely with this issue, but which deals in concept with what is the patented invention. It is four steps in this case, and all those four steps must be performed... Within the term of the patent. Within the term of the patent, that's exactly right. And Mike Agin versus Monsanto has very nice language basically saying that. 271G requires that the patent be issued in force at the time the process is practiced and the product is made. So, I suggest, and the All Elements Rule requires that in order to infringe, you've got to practice all elements of the process. We only practice one element, the last element. The other three were done with authority because DeKalb did it. DeKalb is a party in this case. Now, I will mention one thing. Ms. Noel didn't get to Ajimoto, but Ajimoto has a statement that whether or not the product is authorized to be produced outside the United States is irrelevant. And Monsanto catches that phrase and relies on it. What Monsanto doesn't tell the court is that there was a restriction against sale in the United States in that authorization outside the United States. So, sure, authorization in that case didn't matter because they couldn't sell in the United States. That was the problem in that case. I suggest, Your Honors, that if we prevail on Claim 4 of the second of the 880 patent, I'll for sure write we prevail under 863 because they admit that that is a dependent claim. Well, I understand the issue is not before us. This question about whether or not Syngenta violated the underlying license and that's how it got Steps 1, 2, and 3, that's still pending before the district court? What is pending, Your Honor, is a tortious interference claim. There's an antitrust claim at which point they talked about misappropriation. That issue will be decided in a separate proceeding. There was a separate case filed, an antitrust case. It was consolidated but then separated for trial. So that will be separately tried. Well, the antitrust action was filed by Syngenta, correct? Yes, but there's a tortious interference issue in that case. Now, let me go on to the enablement issue, if I may. And that is, Monsanto's basic position is that the district court converted the claims of the 835 patent from a gene claim to a plant cell claim. That is not so. The claim of that patent basically starts out a chimeric plant gene. It's a gene claim, but it's got a lot of functional limitations in it. And Monsanto would have the court ignore those functional limitations. Those functional limitations require certain events to be able to take place. Namely, that this gene that is claimed be adapted to cause sufficient expression of effusion polypeptide to enhance the glyphosate resistance of a plant cell transformed with a gene. Judge Robinson never said that this is now a gene claim. She said that it is not a gene claim, but it's a cell claim. It is a gene claim with some functional limitations. And I would suggest, Your Honor, that given the fact that the VEC case, which is a very important case, really parallels the facts of this case, and I suggest the court look at it in evaluating the issues. In the VEC case, there was a host, cyanobacterial cells. The host in this case is plant cells. The claim in VEC was chimeric gene. The claim in this case is chimeric plant gene. They both had functional limitations. Does that make a difference? In re VEC probably works against you, doesn't it, Mr. Dunn? No, it works very much for us. Does it? It was found not to be enabled because there was only one cyanobacterial strain disclosed in the spec. And the court held in that case, as it did in the Goodman case, as it did in the PGS case, that it had to be enabled for the full scope of the claim. And in that case, it was not enabled for the full scope of the claim because the cells were not enabled. And in this case, that's exactly the same point. Does the claim have to enable both a monocot and a dicot type of a plant? Absolutely, Your Honor, because the claim calls for a plant cell. And in the PGS case, Monsanto has created all the law in this area because there's been a lot of litigation. And you'll find Monsanto or DeKalb's name on all these cases. In the PGS case, if you look at the district court opinion, you will see that there was, in that case, a reference to a plant cell. And all the parties agreed that it encompassed all plant cells. And when you encompass all plant cells, in this case, plant cells have monocots and dicots. What's the distinction, though, on this issue of, you know, Monsanto claims that you don't have to enable every mode. What's the difference between enabling the full scope and enabling every mode? The cases that Monsanto relies on basically say that you have to have a mode to practice the full scope. A mode. For example, if the claims only called for dicots, and you had four different ways of transforming dicots, and three of them didn't work, that's okay, that's not a problem, because they have a mode of practicing the full scope of that claim, dicots. But when the claim calls for dicots and monocots, or a genus which embraces dicots and monocots, then you have to have a disclosure which enables the full mode of practicing dicots and monocots. And in fact, if you look at the Goodman case, and if you look at the PGS case, you'll see that both of those cases involve monocots and dicots, and both of them involve plant cells, and the court held that both had to be enabled for the full scope, namely monocots and dicots. Now, how does Monsanto respond? Well, again, I've already dealt with it. You only need one mode to practice the claim invention. That doesn't satisfy the requirement that it practice the full extent of the claim. They also say the claims recite plant gene, not a plant cell. The problem there is they're ignoring the functional language, which clearly implicates plant cells, and the district court didn't construe it otherwise. They also argue that once transformation techniques became available after the filing date, a person of ordinary skill in the art could follow Patton's teachings in the design of the gene to provide glyphosate resistance. Well, the problem with that is that the enablement must be at the time of the filing date, and the events they're talking about came in 1992 and 1993, long after the 1986 filing date. I submit, Your Honors, that for all of those reasons, the court should affirm. I would mention only one last point, and that is they raise the point, what should the court do about vacating the district court's claim construction? I suggest that under the broadcast innovation case, where there was a remand, but the claim construction was not vacated because it was not relevant to the issues on appeal, the same rule should apply in this case. Is it fair to do it in a footnote, though, without any explanation? Your Honor, that's right, but if the court wants to, on remand, suggest that when the court goes back down, the court should provide reasons, that would be perfectly appropriate, but I see no reason why the claim construction need be vacated. I think that would be prejudicial and unnecessary in this case, and I think broadcast innovation supports relief. What does it mean to say, for purposes of appeal, I adopt this claim construction? Your Honor, I don't honestly have the foggiest notion of why she said that, because those interpretations are not implicated in this appeal. I really don't know. I hate to say I don't know, but I'll finish on that note if there are no other questions. Thank you. I want that transcript where he said he didn't know. Oh, I had a note saying this case should be affirmed, no remand. If I said anything otherwise, I misspoke. You did say upon remand, Mr. Donner. Ms. Null, you have three minutes. Thank you, Your Honor. And for the reasons that are stated in the brief with respect to footnote A, we don't really know what the interpretations are of those words that are not, or the claim limitations disputed that are not subject to this appeal, and that's the basis for which Montana was asked that the footnote be vacated so the court does have to provide a sufficient reviewable record of what those claim terms actually mean. Do you want us to vacate that regardless of whether the case gets remanded? I think it needs to be vacated and the other summary judgment ruling should be reversed in this case, because clearly with respect to the Shaw patent, the error in the district court's opinion is stated very clearly at A18. She says, similar to Beck, the state-of-the-art at the time of the filing of the 835 patent was unpredictable. Then she goes on to say the patent is directed to transforming plant cells, and that is the error, transforming plant cells with both monocots and dicots with specific genes. But you don't define the gene in any way other than its function. You can't find the gene in any way other than its function. It is in detailed description in the patent specification. If you read the examples, if you read example 1, it goes on for 10 columns, and all it's talking about is how to isolate and find this gene and the different components of the gene, examples 4 through 7, 14 through 17. It's all about how to make a chimeric gene, and this class of chimeric genes that is in the claim. So the claim language actually reads, a chimeric gene comprising colon. And so the appropriate enablement inquiry is whether or not this chimeric gene has been enabled by the teaching of the specification. But you chose a much broader claim language than what appears in the specification. It is not much broader claim language. It is exactly what the specification says you should make. It is not a broad genus of claims. It is a very defined class of claims that is set forth by these definitions of three components. The promoter, and all it says is capable of working in plant cells. And then you have the coding sequence, the chloroplast transit peptide with the EPSPS. And then you have the three prime end of the gene. And these are defined genes that work in a certain way in nature, and it transfers from plant to plant to plant. And there was no expectation in 1986, and there's no evidence in this record, that it wouldn't work in monocots or any other kind of plant. So it doesn't take any kind of modification to get this gene to work. But how would you get it to a dicot? Their transformation methods were known at that time. There was tobacco and petunia and various plant species that were being studied by scientists at that time. But in order for Syngenta to prevail on that basis, there had to be a record. They had to generate clear and convincing evidence that no scientist in 1986 would be able to make this gene, as claimed, it's a claimed gene, work in corn. And that's not the evidence. There's no evidence that this wouldn't work in plants, including corn. So now turning quickly, just one last statement about... Ms. Knoll, I think your time has expired. Thank you, Janet. Thank you, Ms. Knoll.